Michael Gesualdo
mgesualdo@rwmlegal.com
ROBINSON MILLER LLC
One Newark Center, 19th Floor
Newark, New Jersey 07102
Telephone: 973-690-5400

Mark A. Baghdassarian (*pro hac vice)*
mbaghdassarian@kramerlevin.com
Aaron M. Frankel (*pro hac vice)*
afrankel@kramerlevin.com
Cristina Martinez
cmartinez@kramerlevin.com
KRAMER LEVIN NAFTALIS
  & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8363

*Attorneys for Plaintiff and Counterclaim
Defendant Liger6, LLC*

Eric Adam Biderman
biderman.eric@arentfox.com
ARENT FOX, LLP
1675 Broadway
New York, New York 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990

Michael A. Grow (*pro hac vice)*
grow.michael@arentfox.com
ARENT FOX LLP
1717 K Street NW
Washington, DC 20006
Telephone: (202) 857-6389
Facsimile: (212) 857-6395

*Attorneys for Defendants
and Counterclaim Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| LIGER6, LLC,<br><br>Plaintiff/Counterclaim Defendant,<br><br>-against-<br><br>SARTO ANTONIO and SARTO S.r.l.,<br><br>Defendants/Counterclaim Plaintiffs. | Civil Action No. 2:13-cv-04694-JLL-JAD<br><br>Hon. Jose L. Linares, U.S.D.J.<br><br>**JOINT FINAL PRETRIAL ORDER** |

This matter having come before the Court for a pretrial conference pursuant to Fed. R. Civ. P. 16; Michael Gesualdo, Esq., Mark A. Baghdassarian, Esq., Aaron M. Frankel, Esq. and Cristina Martinez, Esq., having appeared for Plaintiff Liger 6, LLC ("Liger6") and Michael A. Grow, Esq. and Eric Adam Biderman  having appeared for Defendants Sarto Antonio and Sarto S.r.l. (together "Sarto"); and counsel all having been notified that:

A jury (non-jury) trial in this matter has been scheduled before Hon. Jose L. Linares, U.S.D.J. on _____

[The parties jointly request the earliest available trial date.  (1) Liger6 is not available for trial from January 25, 2018 through March 9, 2018, March 30, 2018 through April 4, 2018, April 16 through May 18, 2018, June 16 through September 14, 2018 and October 15 through November 16, 2018 and (2) Sarto is not available for trial during the following dates: March 7 through April 30, 2018; May 20 through 30, 2018; July 31 through September 2; September 17 through 21, 2018.

***The following Final Pretrial Order is hereby entered and shall constitute the Final Pretrial Order pursuant to Rule 16 of the Federal Rules of Civil Procedure, and this Final Pretrial Order shall govern the conduct of the trial of this case.***

**A.     Counsel for Liger6:**

Michael Gesualdo
mgesualdo@rwmlegal.com
ROBINSON MILLER LLC
One Newark Center, 19th Floor
Newark, New Jersey 07102
Telephone: 973-690-5400

Mark A. Baghdassarian (*pro hac vice)*
mbaghdassarian@kramerlevin.com
Aaron M. Frankel (*pro hac vice)*
afrankel@kramerlevin.com
Cristina Martinez
cmartinez@kramerlevin.com
KRAMER LEVIN NAFTALIS
  & FRANKEL LLP
1177 Avenue of the Americas

New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8363

**B.**     **Counsel for Sarto:**

Eric Adam Biderman
biderman.eric@arentfox.com
ARENT FOX, LLP
1675 Broadway
New York, New York 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990

Michael A. Grow (*pro hac vice*)
grow.michael@arentfox.com
ARENT FOX LLP
1717 K Street NW
Washington, DC 20006
Telephone: (202) 857-6389
Facsimile: (212) 857-6395

## II.     JURISDICTION

The Court has subject matter jurisdiction under 28 U.S.C. § 1332 and 28 U.S.C. § 1367. There is complete diversity of citizenship between the parties and the amount in controversy with respect to each claim exceeds $75,000 exclusive of interest and costs.

## III.     PENDING/CONTEMPLATED MOTIONS

There are no motions currently pending before the Court. The following motions are contemplated.

### A.     Motions *in Limine*

#### 1.     Briefing Schedule

*Unless otherwise directed by the Court:*

The parties shall have a final meet and confer on motions *in limine* in an attempt to resolve or narrow the issues in dispute by one hundred and two (102) days prior to trial.

Fully-briefed motions *in limine* are due to the Court ninety five  (95) days prior to trial

Oppositions to said motions *in limine* are due seventy for days (74) before trial.

Replies to said Oppositions are due sixty (60) days before trial.

To the extent requested by the Court, oral argument shall be heard on _____.

### 2.    Liger6's Motions *in Limine*

1)    Preclude reference to (a) the Court's Summary Judgment Order (b) any other proceedings or disputes between the parties regarding ownership of the Sarto trademark, including the Italian proceedings and proceedings before the United States Patent and Trademark Office (the "USPTO") as well as (c) Liger6's filing of a trademark application before the USPTO or any discussions between the parties relating thereto (for purposes of this trial, Liger6 will not dispute that Defendants own the Sarto trademark).

2)    Preclude reference to the FINRA investigation of Mr. Bonelli, which was closed without any findings of wrongdoing (including related deposition testimony of Mr. Bonelli).

3)    Preclude any argument that Liger6 is continuing to operate or monetize the sartocycles.com or related websites (including reference to SA2465 or SA2638), as these websites are not operated by Liger6.

4)    Preclude any argument that Defendants are entitled to damages for Liger6's sales of its remaining inventory of Sarto-branded products after March 2013, as any such sales were fully authorized.

5)    Preclude any argument that Defendants are entitled to damages for Liger6's activities after March 2013, as there is no evidence of any sales or profits generated by Liger6 from use of Defendants' trademarks or publicity, other than fully authorized sales of remaining Sarto-branded inventory.

6)    Preclude any argument that Defendants are entitled to damages for tortious interference because there is no evidence of any lost sales due to Liger6's activities.

7)      Preclude reference to correspondence between the parties containing disparaging remarks or adult language (including related deposition testimony of Mr. Bonelli).

8)      Preclude any reference to Mr. Bonelli's prior ventures or employment as unsuccessful (including related deposition testimony of Mr. Bonelli).

9)      Preclude any reference regarding motives for filing the current (and related) action(s).

10)     Preclude any reference as to why the draft written agreements between the parties were not signed.

11)     Preclude Defendants from calling to testify Andrea Maniezzo, Gianluca Fucci, and Max Lelli, as these potential witnesses were never disclosed in Sarto's initial disclosures and Liger6 was never afforded an opportunity to depose any of these witnesses (Liger 6 will withdraw Lyon Tulp as a witness if its motion is granted).

12)     The parties shall not make any reference to the cost of litigating the instant action or to any claims for attorneys fees, which are not to be decided by the jury.

13)     Defendants may not allege, argue or otherwise imply that Plaintiff falsified or created and/or has false financial records.

14)     Preclude Defendants' reliance on the declaration of Jack A. Hitt dated July 13, 2017 and the exhibits cited therein.

### 3.      Defendants' Contemplated Motions *in Limine*

1)      Motion to preclude any mention of reimbursement for Plaintiff's expenses in view of Plaintiff's failure to produce documents called for in discovery relating to such expenses.

2)      Motion to preclude any mention of reimbursement for time spent or any "estimate" as to time spent in selling products in view of Plaintiff's failure to produce any supporting documents in discovery.

3)      Motion to preclude any mention of "the profit Plaintiff may have lost" or any alleged "lost profits" in view of Plaintiff's failure to produce any evidence in discovery related to the issue

of profits made by plaintiff from the sale of frames, including without limitation any profit or loss statements.

4)      Motion to preclude testimony of Liger's Italian attorney Mr. Bongiovanni unless he has personal knowledge of the alleged oral agreement between the parties.

### 4.      Parties' Stipulated Motions *in Limine*

1)      The parties shall not reference or use documents containing personal, irrelevant and unverified information regarding Mr. Bonelli or Mr. Sarto, such as SA2490 and Liger's TX 82-93, which contains phone numbers, tax information, mortgages, voting records, unrelated legal proceedings and in irrelevant speeding ticket.  The parties may, however, excerpt relevant portions from such documents, so long as irrelevant portions are redacted.

2)      The parties shall not make any reference to prior counsel who may have appeared in the case but are no longer counsel of record.  The parties may, however, use trial exhibits that include the name of such former counsel.

3)      The parties shall not present or rely on declarations and/or affidavits served in connection with motion practice in this case except for purposes of impeachment (this does not preclude use of exhibits attached to such declarations or affidavits).

4)      The parties shall not reference any settlement discussions between the parties (this shall not preclude reference to draft contracts or communications relating to such contracts exchanged between the parties or their attorneys).

## IV.      STIPULATION OF FACTS

1.      Plaintiff Liger6, LLC ("Liger6") is a limited liability company duly organized and existing under the laws of New Jersey, located at 78 Amsterdam Avenue, Teaneck, New Jersey 07666.

2.      Marco Bonelli "Bonelli" is an individual, who previously resided at 2315 Windsor Park Court, Englewood, New Jersey 07631, and whose current address is 7050 East Sunrise Drive, Apt. 16204, Tucson, Arizona 85750.

3.      Mr. Bonelli is the sole owner of Liger6.

4.      Defendant Sarto Antonio is an individual located at Via Arno No. 65/67,  30030 Mellaredo di Pianiga (VE), Italy.

5.      On April 30, 2013, Sarto Antonio created Defendant Sarto S.r.l., a limited liability company organized under the laws of Italy, which has an address at Via Arno No. 65/67, 30030 Mellaredo di Pianiga (VE), Italy.

6.      Sarto Antonio is the President of Sarto S.r.l., and his son Enrico Sarto manages the day to day affairs of the company.

## V.      FACTUAL CONTENTIONS

### A.      Liger6's Factual Contentions

Liger6 has been a seller and distributor of bicycles and bicycle components to retailers and individuals throughout North America since 2007.  In August 2010, Sarto approached Liger6 regarding a business relationship under which Sarto would supply bicycle frames manufactured to Liger6's specifications for sale and distribution into the North American market.  Prior to that date, Sarto had exclusively (or nearly exclusively) sold frames in North America as an outsourcer (i.e., providing frames to be sold under other brands), and was not generally known to bicycling distributors and consumers within North America.  Liger6 would market Sarto frames, as well as complete bicycles built from Sarto frames and assembled by Liger6, which would be marked with and marketed under the Sarto brand.

It was Liger6's idea to sell Sarto products exclusively under the Sarto name, and to work to develop that brand within North America.  The parties agreed that, in exchange for Liger6's efforts and investment in developing the Sarto brand, for providing marketing expertise and for undertaking

the expense and risk to invest in developing the brand, Liger6 would have exclusive distribution and selling rights within North America.  Sarto would sell the frames to Liger6 and Liger6 would then resell the frames to distributors, retailers and other customers.  The parties agreed to this arrangement by late 2010.

In reliance on this agreement, Liger6 made considerable efforts and expended significant resources from late 2010 to early 2013 in building its business in North America under the Sarto brand, and began selling bicycles under the Sarto brand in January 2011.  Such efforts included participation in cycling trade shows, meeting and developing relationships with potential distributors, retailers, and end users, and the creation of and expenditure on advertising and promotion, including the *sartocycles.com* website, which was developed with the cooperation of Sarto.  Liger6 created a needle-and-scissors logo for products supplied by Sarto, because "sarto" is an Italian word for "tailor."  During this time and in reliance on its agreement with Sarto, Liger6 invested nearly a million dollars to develop the Sarto brand and develop relationships with retailers, distributors and customers and to purchase Sarto products which Liger6 sold near or even below cost to distributors and market influencers to help develop the market in North America for Sarto-branded products.

After Liger6's substantial development efforts were beginning to develop fruit and Liger6 had or was about to enter into multiple relationships with distributors and retailers to begin carrying Sarto products in significant quantities, Sarto breached its agreement with Liger6 and the implied covenant of good faith and fair dealing by cutting off its relationship with Liger6 and dealing directly with distributors, retailers and customers with whom Liger6 had forged relationships.  In so doing, Sarto breached its arrangement with Liger6 and deprived Liger6 of the profits it would have realized from these sales.  Sarto usurped the goodwill and relationships that Liger6 had developed

over years as a result of its investment of substantial resources, time and effort, in reliance on Liger's agreement with Sarto.

The agreement between Liger6 and Sarto is confirmed by the extensive commercial relationship between Liger6 and Sarto, by Liger6's investment of substantial resources in marketing and business development activities, of which Sarto was aware and cooperated in, by Liger's attendance at trade shows and development of customers on behalf of Sarto, by Liger6's development of a website with the approval of Sarto (and for which Liger6 bore all costs, except for the cost to prepare a video jointly used by Sarto and Liger6), by Liger6's exercise of control over the design of products sold in North America and the marketing thereof, by Liger6's maintenance of liability insurance to cover any claims asserted against Sarto-branded products, and by the exchange of multiple written draft contracts between counsel for Liger6 and Sarto confirming the parties' agreement.  Liger6 engaged in this activity with the knowledge and support of Sarto, and Sarto did not nothing to dissuade Liger6 that it had exclusive rights to the North American market until their business relationship abruptly ended in 2013.  While it continued to invest in building the Sarto brand and market for Sarto-branded products, Liger6 continued to send draft contracts to Italian counsel for Sarto, and Sarto's counsel continually suggested minor revisions to those proposed contracts, thereby demonstrating that the parties' ongoing business relationship.  At no time did Sarto or Sarto's counsel propose changing the contract in a way that was inconsistent with the parties' business relationship that began in late 2010, including that Liger6 would have exclusive rights to sell Sarto products in North America, which the parties agreed upon at the beginning of their relationship.  For example, all six written drafts exchanged between Liger6 and Sarto during 2011 through 2012 expressly provided that Liger6 would have exclusive rights to sell Sarto products in North America.

**B.     Sarto's Factual Contentions**

**The Parties**

1.      Defendant Sarto Antonio (Antonio Sarto) is an Italian citizen who operated as a sole proprietorship under the name and marks SARTO and SARTO ANTONIO for more than 50 years; and he formed Defendant Sarto S.r.l. with his son Enrico Sarto in 2013.  (Defendants are collectively referred to herein as "Sarto.")

2.      Antonio Sarto had sold custom designed, high tech and innovative bicycle frames  in the United States and other countries under the mark SARTO for years before Bonelli expressed an interest in buying SARTO frames.  Documentary evidence of the prior U.S. sale of SARTO products was provided to Liger's counsel before the lawsuit was filed.

3.      Sarto has outfitted some of the most successful pro-cycling teams and riders, as well as cycling enthusiasts in Italy and many other countries.

4.      Sarto's bicycle frames are custom designed and entirely hand manufactured by skilled craftsmen in Sarto's workshop, which is located in Mellaredo di Pianiga, in the Veneto region of Italy.

6.      In 2010, Antonio Sarto and Enrico Sarto met the owner of Plaintiff Liger6 LLC (Liger), Marco Bonelli, for the first time when he made an appointment to visit them at their factory in Italy.

7.      Without asking for any written agreement, Bonelli expressed interest in selling SARTO frames in the United States and, in late 2010,  Liger began ordering SARTO frames for importation into the United States.  Bonelli first began asking for an exclusive distributorship in late 2011.

8.      While Antonio Sarto considered granting such an exclusive distributorship, the parties never reached an agreement on essential terms such as length of exclusivity, minimum sales guarantees, letter of credit requirements and other terms.

9.      One of the main reasons the parties never reached an agreement was Bonelli's repeated filing of trademark applications in which he falsely claimed under penalty of perjury initially that Liger was a joint owner and later the sole owner of the SARTO trademark.  Liger still has two pending applications for registration of the mark SARTO both of which are suspended in view of Sarto S.r.l.'s prior pending application that Liger opposed.

**The Status of the Litigation**

10.      Although Bonelli ceased buying SARTO frames in 2013, it has continued using the SARTO mark on its only website and has continued to unfairly trade on the SARTO name by advertising or selling other products that were not made by Sarto.

11.      Bonelli even caused Liger to file a notice of opposition to Sarto S.r.l.'s application to register SARTO, which application had been approved and published by the United States Patent and Trademark Office ("PTO") on March 26, 2013.

12.      Instead of allowing the PTO to resolve the ownership issue, however, Liger moved to suspend the opposition and filed this lawsuit on August 5, 2013, in which Liger  alleged that it was the sole owner of the trademark SARTO and that by using its own name and mark on its own high tech bicycle frames shipped to the United States, Sarto was liable for trademark infringement and unfair competition.  Liger's fraudulent representations to the PTO have prevented Sarto S.r.l. from obtaining a registration of the SARTO mark for the past four years.

13.      In Count V of its complaint, Liger also vaguely alleged that Antonio Sarto had breached an oral agreement relating to "the manufacture, distribution and sale of bicycle products in the United States."  Liger further alleged that it had fulfilled its obligations under the agreement and that Sarto had breached its obligations (without specifying what either parties obligations were). Liger also alleged in Count VI that Antonio Sarto breached the covenant of good faith by acting arbitrarily and in bad faith to deprive Liger of the benefit of "the agreement."

14.     Sarto filed counterclaims alleging that Sarto S.r.l. owned the mark SARTO and that Liger was liable for trademark and tradename infringement, unfair competition, cybersquatting, breach of the right of publicity (Counts I-VII and XI), tortious interference with prospective advantage (VIII), trade libel (IX),  breach of the covenant of good faith and fair dealing (X), violation of the New Jersey Fraud Act (XII), and unjust enrichment (XIII).

15.     Sarto filed a motion for summary judgment asking for dismissal of all of Liger's claims and for judgment in favor of Sarto on Counts I-VIII and XI) of its counterclaims.

16.     The Court granted summary judgment dismissing all of Liger's claims except its breach of oral contract claim and the breach of the covenant of good faith and fair dealing, and the Court granted summary judgment for Sarto as to liability on Counts I-VII and XI of Sarto's counterclaims.

17.     The matters remaining for trial are Sarto's claim for damages under its Counts I-VII and XI, and for liability and damages under Sarto's counterclaims for tortious interference with prospective advantage (VIII), trade libel (IX),  breach of the covenant of good faith and fair dealing (X), violation of the New Jersey Fraud Act (XII), and unjust enrichment (XIII); and Liger's claims for breach of the oral agreement and the covenant of good faith and fair dealing (Counts V and VI of the Complaint).

**Liger's Admissions that there Never Was any Oral Agreement**

18.     Sarto never agreed orally or in writing to give any "exclusive distributorship agreement" to Liger.

19.     Liger never even claimed there was such an exclusive distributorship agreement until it provided its portion of the draft pretrial order in late December 2016.

20.     Liger never asserted the existence of any oral "exclusive distribution agreement" in its complaint, in response to Sarto's interrogatories, in any of the documents produced by Liger in

discovery, or in Bonelli's deposition where he characterized Liger's relationship with Sarto as a partnership.

21.     Liger produced no documents in discovery showing the existence of any oral agreement between the parties.  To the contrary, many of its documents contain admissions by Bonelli that no such oral agreement ever existed.

22.     For example, the first draft of Liger's proposed exclusive distributorship agreement in 2011, defined Liger's relationship with Antonio Sarto as merely "un collaborazione commerciale" which translates as "a commercial collaboration."  Liger Trial Exhibit  64, p. 2 par. IV.

23.     In an email to Enrico Sarto dated September 3, 2012, Bonelli admitted that the parties had never reached an agreement stating that

. . . "Quanto e'emerso ha notevolmente rafforzato la mia assoluta convinzione che sia urgentemente necessario:
   1.  Decidere se andare Avanti in questa impresa.
   2.  Discutere un nuovo accordo in quanto quelli finora discussi risultano parziali e/o inadeguati
   3.  Qualora si raggiungesse detti accordi e' necessario che vengano urgentemente formalizzati in un contratto scritto (which translates as follows)

"What has emerged has notably reinforced my absolute conviction that it is urgently necessary:
   1. To decide whether to go forward in this enterprise.
   2. Discuss a new agreement in as much as those discussed up to now have been partial and/or inadequate.
   3.  **If we ever reach such agreements** it is urgently necessary that they be formalized in a written contract."  Sarto Trial Exhibit 11. (emphasis added).

24.     In an email dated January 31, 2013, Bonelli admitted that he was waiting for ". . . un contratto definitivo . . . finora mai finalizzato, nonostante le nostre intenzioni . . ." which translates as "**a final contract. . . up to now it has never been finalized,** despite our intentions. . .  "  Liger Trial Exhibit 120/ Sarto Trial Exhibit 27. (emphasis added).

25.     Liger has never identified any duties it assumed as part of any oral exclusive distributorship, such as specific minimum sales levels, minimum advertising and promotion efforts,

duration of the arrangement, obligations to refrain from claiming rights in Sarto's intellectual property or other minimal commitments that a reasonable business person would require in order to grant such an exclusive agreement.

23.     In the first draft of the proposed agreement prepared by Liger, it proposed a two year contract term and a minimum sales guarantee of 200 frames.  And in all of the drafts, Liger proposed that it would be responsible for all advertising and promotion costs.  In 2011, however, Liger sold only 15 frames.

**Liger's Misrepresentations and Inability to Sell Sarto Frames**

26.     Liger's dealings with Antonio Sarto began in or about October 2010 when Bonelli expressed an interest in selling SARTO frames in the United States.

27.     Bonelli told Antonio Sarto that Liger had broad experience in the bicycle business, when in fact Bonelli was a full-time stock broker from prior to meeting Antonio Sarto until 2015.

28.     Neither Liger nor Bonelli had much experience in selling bicycles and there only prior activity had been an unsuccessful attempt to sell frames for an Italian bicycle racer named Max Lelli.  Liger continued selling LELLI  brand frames until at least as late as 2012

29.     Liger had no office, warehouse, sales staff or employees and it sent orders to Antonio Sarto from Bonelli's luxury condo at 2315 Windsor Park Court, Englewood, New Jersey 07631. Even today Liger's address is listed as a single family home at 78 Amsterdam Avenue in Teaneck, New Jersey

30.     After hearing Bonelli's sales pitch, Antonio Sarto began selling a few frames to Liger at the end of 2010 most of which were shipped to Bonelli's condo.

31.      Bonelli told Antonio Sarto he was confident regarding the sale of a few hundred Sarto frames in 2011.  In reality, however, Liger was nothing more than a hobby or tax shelter for

Bonelli as shown by the fact that Liger sold only less than 20 SARTO frames from 2010 to the end of 2011.

32.     Despite Liger's poor sales record, Bonelli hired an attorney in Italy who prepared a one sided, proposed agreement demanding for the first time that Liger be given an "exclusive" right to distribute frames under the mark SARTO in all of the United States, North America, Central America and South America.

33.     There was no reference to any oral agreement between Liger and Antonio Sarto in the first or any subsequent drafts of the proposed agreement prepared by Liger, nor did Bonelli ever explain how he could possibly be entitled to such an exclusive agreement when he sold less than 20 frames in the U.S. in the first year and less than 80 frames in the entire two and one half years during which Liger bought frames from Antonio Sarto.

34.     While Liger may have incurred some expenses in trying to sell the frames it purchased from Antonio Sarto, it did so entirely on its own, in the ordinary course of business without any expectation of or right to receive reimbursement from Sarto.  As shown in Exhibit 2 to Liger's Memo In Opposition to Sarto's Motion to Join Marco Bonelli has a party, Bonelli has greatly exaggerated the expenses it incurred to allegedly promote the SARTO brand by creating financial statements seeking to charge as expenses, against the sale of SARTO products, the purchase price for parts and equipment used in another part of Liger's business and by falsely claiming other expenses unrelated to the sale of SARTO products.

**Bonelli's False Claim of Ownership of the SARTO mark.**

35.     Liger ruined any chance it ever had to obtain an exclusive distributorship by falsely claiming to own the SARTO trademark.

36.     Despite Bonelli's half-hearted approach to selling SARTO bicycle frames and although he had no capability to make frames, Bonelli had a U.S. attorney file a trademark

application on August 17, 2011, in which Bonelli instructed the attorney to falsely declare that Liger and Antonio Sarto were joint owners.

37.     Sarto strenuously objected to Liger's claim of ownership of the mark SARTO and demanded that Liger withdraw the application.

38.     Sarto filed its own application to register as sole owner of the mark SARTO on March 20, 2012.

39.     Despite Antonio Sarto's objections, Bonelli sent Sarto another draft of the agreement on May 10, 2012, which still listed Liger as a joint owner of the mark SARTO.  Again, this draft agreement made no reference to any so-called "oral agreement."

40.     Because Bonelli had not withdrawn the fraudulent trademark application, the PTO issued Reg. No. 4178207 for the mark SARTO listing Antonio Sarto and Liger as joint owners on July 24, 2012.

41.     Bonelli's delay in withdrawing the application and Liger's slow payments to Antonio Sarto and other creditors delayed the negotiations regarding the exclusive distributorship.

42.     On November 18, 2012, the PTO cited Reg. No. 4178207 as a bar to registration of the application Sarto S.r.l. had filed.  Sarto again demanded that the registration be surrendered and on November 28, 2007, Liger finally did so.

43.     Negotiations between the parties' attorneys concerning the proposed exclusive distributorship agreement resumed but, on December 19, 2012, Bonelli filed a second application, Ser. No. 85806954,  in which he declared under penalty of perjury that he was the sole owner of the mark and that no other person (including Antonio Sarto) had the right to use that mark in commerce.

44.     This nearly ended the negotiations for the proposed exclusive distributorship agreement and on January 31, 2013, Antonio Sarto sent a registered letter to Liger demanding that the new SARTO application be withdrawn within 10 days.  However, Bonelli did not withdraw the

application and, instead, filed a another one on March 26, 2013 (Ser. No. 85886347), both of which remain pending in the PTO.

45.     In the latest application, Bonelli again falsely declared under penalty of perjury that Liger was the sole owner of the mark and that no other person (including Sarto) had the right to use that mark in commerce.  At the time Bonelli made this statement, he knew Antonio Sarto had refused to give Liger any rights in the SARTO name and mark and that Sarto had its own prior pending application on file.

46.     In February 2013, Enrico Sarto traveled to Utah for a meeting with Bonelli and a prospective customer.  At this meeting, Bonelli told Enrico that he did not wish to go forward with the relationship.

47.     Bonelli still had not withdrawn the fraudulent application on March 4, 2013, when he sent an email to Enrico Sarto proposing a meeting in Italy to discuss whether it was appropriate to continue the relationship.

48.     On March 9, 2013, Enrico Sarto responded saying that Bonelli's filing of the new SARTO application created a grave problem.  He also noted that Bonelli had been asked to withdraw the application and that he had not honored that request. This had caused a loss of trust and Sarto no longer wished to engage in further negotiations on the proposed agreement. Enrico declined the meeting and told Bonelli he was referring the matter to the lawyers.  He also sent Bonelli invoices for two frames that had been ordered by Liger and indicated they would be shipped after receipt of payment.

49.     Bonelli sent a vulgar reply, refused to pay for the frames he ordered and never placed any further orders.

50.     By March 2013, nearly two and a half years after Bonelli first approached the Sartos, Liger had sold less than 80 SARTO frames in the United States.  At the same time, Liger sold at

least 44 Max Lelli frames.  Liger admitted in response to Sarto's Interrogatory No. 10 that total revenue from the resale of SARTO frames and finished bicycles was only approximately $178,000.

51.     Although Bonelli claimed to have spent a significant amount of money in promoting the SARTO brand, this claim is as transparently dishonest as his claim to own the SARTO trademark. The expense summary produced by Liger in discovery was largely unsupported by any invoices or other original records and it indicated that Bonelli comingled Liger funds with his own. While Liger was demanding an exclusive distributorship to sell SARTO frames, he was devoting little time to the SARTO brand and simultaneously sold competing frames under the MAX LELLI brand to prospective purchasers of SARTO products.

52.     In addition to disqualifying himself and Liger by falsely claiming ownership of the SARTO trademark, Bonelli destroyed any possibility of a future relationship with Sarto by sending obscene emails that were so insulting and threatening in tone that the Sartos complained to the Italian police that they were afraid Bonelli would commit acts of violence against them.

53.     Antonio Sarto filled every order Liger was willing to pay for but Liger refused to provide a requested letter of credit for some sales.  And Liger broke off the relationship with Sarto by refusing to pay for the last shipment of frames it had ordered and by declining to order additional frames.

54.     Sarto has been damaged severely by Bonelli's reprehensible conduct and this has been compounded by the letters he sent to Sarto customers in which he falsely alleged that Liger owned the SARTO trademark and that such customers would be sued if they purchased SARTO branded products from Sarto.  This deliberate interference in Sarto's business along with Bonelli's continued assertion of rights in SARTO before the PTO was part of a vendetta designed to injure Antonio and Enrico Sarto personally and commercially.

55.     Bonelli actually visited some of Antonio Sarto's U.S. customers and prospective customers, before Bonelli elected to discontinue importing Sarto's frames and bicycles.  As a result, Liger had full knowledge of Sarto's economic relationships with other importers, distributors and other customers and that these relationships would provide Sarto with a probability of future economic benefit.

56.     Liger ceased buying frames from Antonio Sarto in early 2013 but it continued to operate its website and to hold itself out as an authorized supplier of SARTO bicycle frames and bicycles.  Indeed, despite the Court's summary judgment on the trademark issues in this case, Liger and Bonelli have continued the acts of trademark and tradename infringement, cybersquatting and unfair completion by using the www.sartocycles.com website, along with photographs of Antonio Sarto to continue to sell bicycle products made by others.  Liger also used two additional domain names, sartobikes.com and sartobicycles.com, which were linked to the www.sartocycles.com website.

57.     Moreover, despite the entry of judgment on Sarto's cybersquatting claim, Liger at some point monetized its www.sartocycles.com website and Liger or someone in league with Liger has been receiving click through revenue from ads placed on the site.  These ads are primarily for competing bicycle sellers and Liger and Bonelli allowed them to be placed under the www.sartocycles.com  website as part of the vendetta and to divert prospective SARTO buyers to competing bicycle companies.

58.     Liger also injured Sarto by committing fraud on the PTO in procuring a registration of the mark SARTO in connection with which Liger and Bonelli made materially false statements of fact, with actual knowledge of the falsity and with a deliberate intent to deceive the PTO.  Sarto suffered a serious disruption of its business and had to incur enormous expense to demonstrate to this court and to others that Liger never had any ownership interest in the name and mark SARTO.

59.     After it became evident that he was a complete failure in the bicycle business, Bonelli caused the filing of the frivolous Complaint in this action, which has no basis in law and which was calculated primarily to pressure Sarto into paying him money.  This has caused undue burden and expense for Sarto and it has wasted the resources of the court.

60.     While Liger blames Antonio Sarto for refusing to grant an exclusive distributorship, Liger's situation is entirely due to Bonelli's dishonesty, incompetence and mismanagement, and his refusal to negotiate in good faith.  The false claim of trademark rights in the mark SARTO was in itself a serious breach of the covenant of good faith and fair dealing and it shows that Bonelli was never serious about selling SARTO frames in the U.S.  If Liger had owned the SARTO mark as Bonelli claimed, it would not have needed an exclusive distributorship agreement.

61.     Neither Bonelli nor Liger ever offered to pay anything for an ownership right in the SARTO mark and the correspondence between the parties and their Italian lawyers shows that Bonelli's demand for an ownership interest was unequivocally rejected and that Liger never acquired any rights in the SARTO mark.

**Sarto's Successful Action Against Liger in Italy**

62.     On March 21, 2014, Sarto S.r.l. filed a civil action and request for preliminary injunction ("Application for Precautionary Measure") against Liger in the Court of Venice, Italy, which specializes in business matters and also functions as the European Community Trademark Tribunal.  The Court ruled in favor of Sarto S.r.l. and issued an order preliminarily enjoining Liger from engaging in certain activities.

63.     For example, the order:

1)     prohibits Liger from using, when conducting its business activities, the domain names "sartocycles.com" and "sartobikes.com";

2)      prohibits Liger from using in Italian or European territory, the "SARTO" expression and trademark in advertisements, on sites it operates, in meta-tags and generally in business activities;

3)      prohibits Liger from using photographs reproducing the faces of Antonio Sarto and Enrico Sarto, texts relating to the business activities conducted by Antonio Sarto and his personal business history, photographs of bicycle frames bearing the SARTO trademark, the names of Antonio Sarto and Enrico Sarto and references to the Sarto family, and the signature of Antonio Sarto; and

4)      imposes a fine of € 1,000 euros for every violation of the order subsequently observed.

## VI.    STATEMENT OF DAMAGES CLAIMED

### A. Liger6 Damage Claim

Liger6 seeks damages on its Breach of Contract and Breach of Implied Covenant of Good Faith and Fair Dealing claims.  These damages include:

(1) Reimbursement of Liger6's expenditures incurred in reliance on Sarto's performance under the parties' agreement, honoring the implied covenant of good faith and fair dealing and honoring Liger6's exclusive rights to the North American territory and to profit from sales to distributors, retailers and customers that Liger6 developed.  These expenditures totaled at least $750,000.  In addition to these expenditures, Mr. Bonelli and Ms. Canal invested hundreds of hours of their time over three years to develop the market for Sarto's products, forgoing other opportunities.  Liger6 conservatively estimates the value of this time as worth no less than $750,000. Liger6 will prove this claim at trial by offering its financial records documenting its expenditures and the testimony of Mr. Bonelli and Ms. Canal regarding their expenditures and investment of time.

(2) The profits Liger6 would have obtained if Sarto has complied with the parties' agreement, honored the implied covenant of good faith and fair dealing and honored Liger6's

exclusive rights to the North American territory and to profit from sales to distributors, retailers and customers that Liger6 developed.  This profit would have been approximately 40-50% of Sarto's revenue for sales within North America.  Liger6 will establish this profit margin through documents and witness testimony showing its markup on sales and the customary markup within the industry. Defendants are in the process of providing to Liger6 the revenue for relevant sales in North America (including all sales of Sarto-branded products in North America and the sales of non-Sarto-branded products to distributors and customers with whom Liger6 created the relationship).  This revenue information, as well as publicly available reporting on Defendants' revenue, will be used to show Defendants' revenue at trial, from which Liger6's expected profits may be calculated by applying its expected profit margin, i.e., 40-50% of the revenue.  This approach is extremely conservative as it does not take into account the additional accounts and relationships Liger6 was in the process of opening when Sarto breached their agreement.  Also, as indicated above, it appears that Defendants have underreported the relevant revenue.  After the conclusion of the trial, Liger6 will seek an accounting for Sarto's sales after 2016 and post-trial.

(3) Liger6 reserves the right to seek attorneys' fees, costs and enhanced, exemplary and punitive damages, as a prevailing party and for Sarto's bad faith conduct.  Liger6 will document is attorneys' fees and costs at such time as directed by the Court.

### B.  Sarto's Claim for Monetary Relief

In addition to the injunctive relief sought in the Complaint, Sarto seeks monetary relief pursuant to 15 U.S.C. 1117, namely, that Liger and Bonelli personally be required to pay all of the costs and attorneys' fees incurred by Sarto in this case, because this is an exceptional case within the meaning of 15 U.S.C. 1117.  Sarto also seeks actual and punitive damages in such amount as may be proven at trial caused by Liger's acts of infringement, unfair competition, cybersquatting,

misappropriation of the right of publicity, fraud, unjust enrichment and tortious interference with prospective advantage.

Sarto seeks recovery on its statutory and common law claims for infringement, unfair competition, fraud and unjust enrichment counts for Liger's continuing acts of infringement in an amount equivalent to the amount of Sarto's lost sales, which are estimated to be at least $200,000 and/ or Liger's profits based on the revenue Liger received from the sale of bicycles, bicycle parts and other goods or services from March 2013 to the present and any other revenue derived from Liger's ongoing use of the mark SARTO, alone or in combination with other words, on its website or in other ways, less any allocable costs.  The precise amount of Liger's profits will be determined upon receipt of documents showing Liger sales and income since March 2013.

Sarto seeks recovery under its statutory cybersquatting count for revenue obtained by Liger or Bonelli from the use of or trafficking in the domain names sartocycles.com, sartobikes.com, sartobicycles.com and any other domain names containing the word "Sarto," including click-through revenue derived from said domain names or websites.  Alternatively, prior to entry of final judgment, Sarto may elect to receive an award of statutory damages in the amount of $100,000 for each of the three Sarto domain names that Liger or Bonelli continued using after March 2013.

Sarto seeks recovery on its common law claims of tortious interference with prospective advantage based on the fraudulent claims by Liger and Bonelli to prospective customers and to the PTO as to Liger's alleged ownership of the SARTO Mark and based on the threatening letters and false oral statements made by Liger and/or Bonelli that were calculated to deter such customers from doing business with Sarto.  Sarto seeks damages for any sales of frames, bicycles or parts made by Liger to such customers.  Sarto has asked for documents relating to Liger's sales after March 13, 2013 and Liger has refused to produce any such documents.  Sarto is writing a letter to the court seeking an order compelling Liger to produce documents concerning these sales.

Sarto seeks recovery for Liger's Misappropriation of the right of publicity based on a reasonable royalty of $10,000 per year from 2013 through the time of trial or 10% of all revenue earned by Liger during that time, whichever is greater.

## VII.   STATEMENT OF LEGAL ISSUES PRESENTED

### A.   Liger6's Legal Issues

1.   Did Sarto breach its agreement with Liger6?

2.   Did Sarto breach the implied covenant of good faith and fair dealing in its agreement with Liger6?

3.   Is Liger6 entitled to recover damages from Sarto on its claim for breach of contract, and if so how much?

4.   Is Liger6 entitled to recover damages from Sarto on its claim for breach of implied covenant of good faith and fair dealing, and if so how much?

5.   Is Liger6 entitled to attorneys' fees, costs and enhanced, exemplary and punitive damages, as a prevailing party and for Sarto's bad faith conduct? (To be presented after trial).

### B.   Sarto's Legal Issues

1.   Did any oral agreement ever exist between the parties?

2.   Are the allegations by Liger and Bonelli as to the existence of an oral agreement willful and deliberate misrepresentations of fact?

3.   Was Antonio Sarto justified in refusing to sign a written agreement with Liger due to Liger's fraudulent claim of ownership of the SARTO Marks, Liger's filing of a new application to register the mark SARTO during the pendency of the  negotiations regarding a written agreement, Liger's lack of success in selling SARTO brand frames, Liger's refusal to agree to minimal sales goals, refusal to obtain a letter of credit to cover orders, Liger's refusal to pay for products that it had ordered from Sarto, Liger's decision to stop ordering products from Antonio Sarto, Bonelli's volatile temper and the obscene and threatening

communications he sent to the Sartos, Liger's refusal to engage in any further negotiations concerning the proposed agreement?

4.    Should Liger be barred from offering any damage evidence due to its refusal to produce expense records and other records responsive to Sarto's discovery requests?

5.    Should Liger be barred from offering any damage evidence due to Bonelli's  creation of false financial records, the highly speculative nature of its damage claims, the lack of expert testimony, and the absence of any evidence of causation?

6.    Should Liger be required to pay actual or statutory damages for its ongoing acts of infringement, unfair competition, cybersquatting, and violation of the right of publicity for which it has already been found liable?

7.    Did Liger tortiously interfere with Sarto's prospective economic advantage by falsely alleging to Sarto's prospective customers, publicists and others that Liger owned the mark SARTO, that Sarto had no right to sell products under the mark SARTO and that any such customers who purchased products from Sarto or otherwise assisted Sarto would be sued?

8.    Should Liger be permanently enjoined from interfering in Sarto's business affairs?

9.    Should Liger be obligated to pay compensatory damages, including attorneys' fees and punitive damages in an amount to be established at trial to Sarto for Liger's acts of fraud and tortious interference with Sarto's prospective advantage?

10.    Did Liger, his counsel, or both file this action in bad faith with actual knowledge of the falsity of the allegations contained in its Complaint and with a malicious intent to cause harassment, economic injury and undue expense?

11.    Is this is an exceptional case within the meaning of 15 U.S.C. 1117 and should Liger and Bonelli be ordered to pay all of Sarto's legal fees and costs in this action?

## VIII.   JUDICIAL NOTICE

The parties do not have any requests for judicial notice at this time but reserve the right to request such notice if the facts should so warrant.

## IX.   EXHIBITS:

*(Each party shall list separately and describe with particularity each exhibit which it intends to use at the trial of this case. Any exhibit not listed may not be used during the parties' case-in-chief, unless the existence of the exhibit, despite due diligence, was unknown to the party and its counsel at the time of submission of this order. This list shall be seasonably supplemented upon the discovery of a new exhibit. If a party intends to use no exhibits at trial for any purpose, the party shall so state. Exhibits should be pre-marked prior to trial.)*

Liger6's proposed trial exhibit list, along with Sarto's objections, is provided as Attachment A.

Sarto's proposed trial exhibit list, along with Liger6's objections, is provided as Attachment B.  Sarto intends to supplement its trial exhibit list with documents that are the subject of a subpoena served on the host of Liger's website at www.sartocycles.com.

For purposes of trial, the parties hereby stipulate that all trial exhibits identified in Attachments A and B are authentic and, if created by a party, were created by that party in the ordinary course of business.

The parties will exchange copies of pre-marked exhibits by no later than thirty (30) days before trial.

The parties exchanged certified translations of foreign language trial exhibits on February 15, 2017.

## X.   EXPERT WITNESSES:

The parties will not be calling any expert witnesses.

## XI.   FACT WITNESSES:

*(The name of each witness whom the party intends to call at trial shall be listed with a short identifying statement. A summary of the anticipated testimony of each witness must be provided. Except for rebuttal witnesses, no party shall call a witness at trial whose name does not appear on that party's witness list, unless the existence of the potential witness was unknown to the party, despite due diligence, at the time of submission of this order. Upon the discovery of a new witness,*

*the name of such witness and a summary of the testimony shall be seasonably supplied to all parties and the pre-trial order amended.)*

### A. Liger6's Fact Witnesses

Liger6 identifies the following individuals as fact witnesses it will or may call at trial.

Liger6 reserves the right to call any witness listed on Sarto's list of witnesses.

- **Marco Bonelli** (will call): Mr. Bonelli is the founder and principal of Liger6. Mr. Bonelli will testify regarding the formation and business of Liger6, its relationship with Sarto, Liger6's efforts to market, promote and develop the Sarto brand in North America, the limited extent of Sarto's business, brand and relationships within North America prior to the efforts of Liger6, the valuable sales relationships Liger6 created in North America, Sarto's usurpation of the relationships and goodwill created by Liger6, the agreement between Liger6 and Sarto, Sarto's breach of that agreement and Liger6's damages, including its expenditures in reliance on Sarto's compliance with their agreement and the profits it would have earned if Sarto had performed.

- **Flavia Canal** (will call): Ms. Canal is the wife of Mr. Bonelli and a member of Liger6. Ms. Canal helped manage Liger6. Ms. Canal will testify regarding the formation and business of Liger6, its relationship with Sarto, Liger6's efforts to market, promote and develop the Sarto brand in North America, the limited extent of Sarto's business, brand and relationships within North America prior to the efforts of Liger6, the valuable sales relationships Liger6 created in North America, Sarto's usurpation of the relationships and goodwill created by Liger6, the agreement between Liger6 and Sarto, Sarto's breach of that agreement and Liger6's damages, including its expenditures in reliance on Sarto's compliance with their agreement and the profits it would have earned if Sarto had performed.

- **Antonio Sarto** (will call): Mr. Antonio Sarto is the President of Sarto. Mr. Antonio Sarto will be questioned regarding Sarto's relationship with Liger6, the extent of Sarto's sales and relationships in North America prior to its relationship with Liger6, Liger6's efforts to market, promote and develop the Sarto brand in North America, the valuable sales relationships Liger6 created in North America, Sarto's usurpation of the relationships and goodwill created by Liger6, the agreement between Liger6 and Sarto, Sarto's breach of that agreement, Liger6's damages and Sarto's sales in North America.

- **Enrico Sarto** (will call)**:** Mr. Enrico Sarto is the son of Antonio Sarto, and Vice President of Sarto. Mr. Enrico Sarto will be questioned regarding Sarto's relationship with Liger6, the extent of Sarto's sales and relationships in North America prior to its relationship with Liger6, Liger6's efforts to market, promote and develop the Sarto brand in North America, the valuable sales relationships Liger6 created in North America, Sarto's usurpation of the relationships and goodwill created by Liger6, the agreement between Liger6 and Sarto, Sarto's breach of that agreement, Liger6's damages and Sarto's sales in North America.

- **Soren Krebs** (may call): Mr. Krebs is a distributor of bicycles.  Mr. Krebs will be questioned regarding his recruitment by Mr. Bonelli to be a salesperson for Liger6 and to sell Sarto-branded equipment and help forge additional relationships for the Sarto brand based on Krebs' preexisting relationships, his recruitment by Sarto to work directly with Sarto usurping his relationship with Liger6, and the limited extent of Sarto's business, brand and relationships within North America prior to the efforts of Liger6.  Mr. Krebs will also be questioned regarding Liger6's damages, including Sarto's sales within North America.

- **Greg Honn** (may call)**:** Mr. Honn is a Connecticut-based, independent bicycle products representative.  Mr. Honn served as a mentor to Mr. Bonelli and advised Mr. Bonelli regarding the formation of Liger6.  Mr. Honn introduced Mr. Bonelli to Mr. Krebs.  Mr. Honn will corroborate various aspects of Mr. Bonelli's testimony, such as the nature of Liger6's relationship with Sarto, the limited extent of Sarto's business, brand and relationships within North America prior to the efforts of Liger6, Mr. Krebs and other distributors, Sarto's usurpation of Liger6's relationship with Mr. Krebs, and Liger6's substantial efforts to develop the brand, distributor and retailer relationships and market for Sarto products within North America.  Mr. Honn will also testify regarding his personal knowledge of the operation of the bicycle market in North America.

- **Filippo Rinaldi** (may call): Mr. Rinaldi, of Vicenza, Italy, is a consultant for companies within the bicycle industry.  Mr. Rinaldi introduced Mr. Bonelli to Sarto.  Mr. Rinaldi will corroborate various aspects of Mr. Bonelli's testimony, such as the nature of Liger6's relationship with Sarto and distributors, that nature of Sarto's business, the limited extent of Sarto's business, brand and relationships within North America prior to the efforts of Liger6, and Liger6's substantial efforts to develop the brand, distributor and retailer relationships and market for Sarto products within North America.  Mr. Rinaldi will also testify regarding his personal knowledge of the operation of the bicycle market in North America.

- **Luca Bongiovanni** (may call): Mr. Bongiovanni is an Italian lawyer.  Liger6 retained Mr. Bongiovanni to negotiate the formal written contract with Sarto that confirmed the parties' existing agreement.  Mr. Bongiovanni will testify regarding these negotiations, the various drafts exchanged between Liger6 and Sarto and communications with Sarto and its counsel.

- **Lloyd Tulp** (may call)**:** Mr. Tulp is a resident of Tenafly New Jersey.  He will testify regarding Mr. Bonelli's reputation within and efforts on behalf of the cycling community.  ***Liger6 will withdraw Lloyd Tulp as a witness if Defendants withdraw as witnesses Andrea Maniezzo, Gianluca Fucci and Max Lelli, who were not identified in Defendants' initial disclosures.***

## B.   Sarto's Witnesses

- Enrico Sarto (will call)  Enrico Sarto is Antonio Sarto's son who runs the day to day affairs of Sarto and has personal knowledge of the facts alleged in the Counterclaims and the falsity of the claims asserted by Liger in this matter, including the misrepresentations made by Liger in the pleadings filed in this case, the false statements made by Liger to

the Patent and Trademark Office, Sarto's objections to and Liger's surrender of the registration for the mark SARTO that Liger procured without authorization in the name of Liger and Sarto Antonio, Liger's subsequent filing of applications to register SARTO in the name of Liger alone during the course of negotiations with Sarto's attorney concerning a written agreement, Bonelli's failure to withdraw the unauthorized applications for the mark SARTO when asked to do so during negotiations between the parties, the obscene, insulting and threatening communications made by Bonelli to the Sartos, the filing of a complaint with the Italian police based on the Sarto's fear of personal injury caused by Bonelli's threats, Liger's failure to make timely payments for products ordered on credit from Sarto, Bonelli's refusal to negotiate in good faith, Bonelli's termination of negotiations relating to the , the impact that Bonelli's acts of tortious interference had on Sarto's ability to develop business in the United States

- Antonio Sarto (may call)  Antonio Sarto is the founder of Sarto Antonio and Sarto S.r.l. and he may testify on the same subjects listed above under Enrico Sarto.  He is unable to travel to the United States because of his age and health problems, as shown by certifications from his physician and his own declaration as to the state of his health.  In light of this, if Mr. Sarto is called to testify, the defendants have moved to have Mr. Sarto's testimony be conducted by video connection, either by stipulation or, if necessary, upon motion to the Court.

- Marco Bonelli (will call)  Mr. Bonelli will be questioned regarding his knowledge of the falsity of the allegations contained in the complaint, the obscene and insulting threats that he made toward the Sartos, including his threats to harm them physically and economically, the falsity of the claims asserted by Liger in this matter, the misrepresentations made by Liger in the pleadings filed in this matter, the false statements made by Liger to the Patent and Trademark Office, Sarto's objections to and Liger's surrender of the registration for the mark SARTO that Liger procured without authorization in the name of Liger and Sarto Antonio, Liger's subsequent filing of applications to register SARTO in the name of Liger alone during the course of negotiations with Sarto's attorney concerning a written agreement, Bonelli's refusal to withdraw the unauthorized applications for the mark SARTO when asked to do during negotiations between the parties, the obscene, insulting and threatening communications made by Bonelli to the Sartos, Liger's failure to make timely payments for products ordered on credit from Sarto, Bonelli's refusal to negotiate in good faith, Bonelli's threatening letters sent to customers of Sarto after Liger elected to discontinue buying SARTO products, his misrepresentations as to experience in the bicycle market, his prior failed relationship with Italian bicycle racer Max Lelli, the dispute he had against Mr. Lelli, the money he extracted to settle the dispute, the threats he made against Mr. Lelli to deter him from becoming a witness in this action, and the falsification of alleged financial records produced in this proceeding.[1]

---

[1] Liger6 objects to Defendants' disclosure that Mr. Bonelli may testify at trial regarding "the falsification of alleged financial records produced in this proceeding."   As Liger6 previously explained, this allegation is entirely baseless, improper and untimely.  Liger6 intends to move to preclude Defendants from eliciting any evidence, argument or testimony regarding this baseless allegation.

- Flavia Bonelli (may call)  Ms. Bonelli may be questioned concerning her communications with the Sartos and her knowledge as to the conduct of her husband described above.

- Andrea Maniezzo (may call) Mr. Maniezzo is an Italian attorney who represented Sarto in connection with the draft written agreements proposed by Liger in this case.  He may be questioned to rebut Liger's allegations concerning the scope of the negotiations and the reasons for termination of the agreement.

- Gianluca Fucci (may call) Mr. Fucci is an Italian attorney who has represented Sarto and he may be questioned concerning the litigation between the parties in Italy and to rebut allegations made by Liger witnesses.

- Max Lelli (may call)  Mr. Lelli is a former Italian bicycle racer who formerly worked with Bonelli in connection with the sale of bicycles in the United States.  Mr. Lelli may testify to rebut allegations that Bonelli has made or may make concerning his relationship with Lelli and the manner in which that relationship was terminated.


### C.      Objections to Potential Witnesses

Liger6 objects to Andrea Maniezzo, Gianluca Fucci and Max Lelli as witnesses in this case. Defendants' did not identify any of these witnesses in their initial disclosures as required under Rule 26 of the Federal Rules of Civil Procedure.

Sarto objects to Mr. Bongiovanni as a witness except to the extent he has personal knowledge of the alleged "oral exclusive distributorship agreement" between Liger and Sarto. Sarto objects to Mr. Tulp as a witness because he was not identified in Defendants' initial disclosures or in answer to Sarto's discovery requests as required under Rule 26 of the Federal Rules of Civil Procedure and is not qualified to provide admissible evidence (either testimony or documentary evidence) under Rules 401, 601, 602, 701 and/or 702 of the Federal Rules of Evidence.

## XII.   DEPOSITION TESTIMONY TO BE READ: (PAGES - LINES)

*Note: the parties expect that the Court's anticipated rulings on the currently pending motions and the proposed motions in limine should resolve any objections to deposition testimony.*

Liger6's designations of deposition excerpts it expects to offer as part of its case-in-chief, along with the other side's objections and counter-designations, is attached hereto as Attachment C.

Provided the Court allows the parties to read deposition excerpts Sarto expects to offer as part of its case-in-chief, along with Liger's objections and counter-designations is attached hereto as Attachment D.   All admissible deposition counter-designation excerpts will be introduced simultaneously in the sequence in which the testimony was originally given.  The parties will not read in objections or colloquy between counsel unless necessary to give context to the designated testimony.

The parties agree to the following schedule for the exchange of deposition designations and counter-designations to be introduced at trial:

By 5:00 PM seven (7) days before the first day of trial, the parties will identify by email the final deposition designations they intend to introduce at trial.

By 5:00 PM five (5) days before the first day of trial, the parties will identify by email the counter-designations to the designated testimony.

**XIII.   TO BE SUBMITTED:**

No later than ten (10) days before the date set for trial or at such time as the Court may direct, each party shall submit:

a. Requested Voir Dire Questions;

b. Form of Verdict Sheet (including Special Interrogatories); and

c. Requests to Charge

d. List of Objected and Unobjected Exhibits

[To the extent requested by the Court] Trial Briefs shall be submitted by no later than _____.  Trial Briefs shall be no more than _____ pages and shall address _____.

## XIV.   BIFURCATION:

### A.      Joint Proposal

The parties' claims for attorneys' fees, costs and exceptional case/punitive damages shall be presented to the Court after the conclusion of the trial, as directed by the Court, and are not to be presented to the jury.

## XV.   ESTIMATED LENGTH OF TRIAL:

The parties estimate that a jury trial will take three to five (3-5) days, including summation.

## XVI.  TRIAL DISCLOSURES

*Note: the parties expect that the Court's anticipated rulings on the currently pending motions and the proposed motions in limine and negotiations among counsel should resolve most objections to the parties' proposed trial exhibits.*

The parties agree to the following schedule for the exchange of witnesses, exhibits and demonstratives to be introduced at trial:

By 5:00 PM thirty five (35) days before the first day of trial, the parties will identify by email the order of witnesses they will call during their case in chief and the exhibits that will be introduced with each witnesss in their case in chief.  The parties will make a good faith effort to identify only exhibits that will actually be used with each witness, and not to designate an excessive number of exhibits.

By 5:00 PM  thirty-three (33) days before the first day of trial, the parties will identify by email any objections to the exhibits they intend to present to the court.

By 5:00 PM thirty-two (32) days before the first day of trial, the parties will meet and confer regarding objections to exhibits and demonstratives.  To the extent there are unresolved issues, the issues will be presented to the Court thirty (30) days before trial by a joint submission, which will identify the disputed exhibits and demonstratives and list associated objections without argument.

By 5:00 PM five (5) days before the first day of trial, the parties will exchange any demonstratives they will use at trial.  Demonstartives that simply reproduce portions of trial exhibits or deposition testimony need not be exchanged.

## XVII.  COPIES OF EXHIBITS:

The parties will exchange electronic copies of all trial exhibits no less than thirty (30) days before trial.  The parties will deliver to the Court a bench book of exhibits before the start of trial.

## XVIII. AMENDMENTS TO PRETRIAL ORDER

Pursuant to the Court's order, Sarto served a subpoena on Network Solutions, the host of the website www.sartocycle.com, on which click through advertisements are being displayed. Documents were due to be produced on November 28, 2017.  However, as of that date, no documents were produced on that date and no request for extension of time to respond was received by Sarto.  On the following day, Network Solutions acknowledge receipt of the subpoena and stated that the earliest stated that the earliest date on which it could produce documents.  Sarto informed Liger that it could not complete its portion of the pretrial order until it received documents responsive to the subpoena.  After conferring, the parties agreed to submitting the pretrial order with a stipulation that the parties could supplement exhibit lists and the text of the order based on any new materials (e.g., documents and information) received in response to the subpoena (and reserving the right to assert all objections thereto).

**CONCLUDING CERTIFICATION**


      We have carefully and completely reviewed all parts of this order prior to its submission to the Court. The parties are reminded that they must amend the Pretrial Order for any additional witnesses or exhibits. Further, it is acknowledged that amendments to the Pretrial Order will not be permitted except where the Court determines that manifest injustice would result if the amendment were not allowed.

Attorney(s) for Plaintiff:         Attorneys for Defendants:

*/s/ Mark A. Baghdassarian*        */s/ Michael Grow*

*/s/ Aaron M. Frankel*          */s/ Eric A. Biderman*

*/s/ Cristina Martinez*

*/s/ Michael Gesualdo*

      Entry of the foregoing Joint Final Pretrial Order is hereby APPROVED this

_____day of _____, 20_____.


_____
UNITED STATES MAGISTRATE JUDGE